Filed 3/2/23 Certified for Publication 3/10/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J.M. et al., Persons Coming Under the Juvenile Court Law. | B313754 |
| | (Los Angeles County Super. Ct. Nos. 19CCJP08077, 19CCJP08077B 19CCJP08077C |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. M.M., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Linda L. Sun, Judge.  Affirmed.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

---

In February 2020, father M.M. and mother J.M. pled no contest to a dependency petition regarding their minor children, J. and M. (along with their now-adult sibling Mi.), based on the parents engaging in repeated conflicts in the children's presence. The juvenile court found jurisdiction over the children pursuant to Welfare and Institutions Code section 300[1] and removed them from both parents' custody, finding that the ongoing conflict caused a substantial risk of harm to the children, including serious mental health issues for J.  The court returned the children to mother and father in October 2020 but maintained jurisdiction.

In May 2021, the court terminated jurisdiction at a section 364 status review hearing, with an exit order granting shared legal custody of J. and M. to mother and father, but sole physical custody to mother.  Father appeals from that exit order, arguing that the court erred in terminating jurisdiction and applied the wrong standard to remove the children from his custody.  We find no error and therefore affirm.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

# BACKGROUND

## I.    Prior Referrals

Prior to the events giving rise to this case, mother and father were married and living together with their three children: Mi. (born 2003), J. (born 2005), and M. (born 2011).[2] The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in August 2018, after receiving a referral alleging that mother and father argued frequently in the presence of the children. One of the children reported hearing mother say to father behind a closed door, "You promised not to point that gun in my face again." The caller also reported incidents of father hitting the children.

A DCFS children's social worker (CSW) interviewed J. and Mi. at school in August 2018. J. said that she heard her parents yelling at each other "often," including father calling mother a "bitch." She became tearful while discussing her parents' fighting and said that father had a temper and often drank alcohol at night. Mi. told the CSW that father "gets a little crazy and he screams at everyone, throwing stuff around." He stated that he was scared father "would do something to my mom. I hear them in the middle of the night screaming." Mi. became emotional and expressed concern that father would find out what Mi. had reported to the CSW. He also said that father had hit him and pushed him to the ground. Mi. stated he previously witnessed father push mother into a door and then scream at the

---

[2]    Mother and Mi. are not parties to this appeal. Mi. was initially included in the dependency petition, but the juvenile court dismissed him when he turned 18 in 2021 and he was not subject to the orders from which father appeals. We include facts regarding mother and Mi. only as relevant to this appeal.

3

children to go to their rooms. More recently, he said that he would hear "banging, sometimes my mom screaming 'my hair.' I hear her scream in pain." Mi. told the CSW that father was very controlling, had a "big temper," and bragged about having a gun in the home.

At a follow up meeting with the CSW in March 2019, Mi. stated that the situation had improved, but that mother and father still argued all the time, often keeping him up at night. He also stated that father was very aggressive, directed mostly at mother, and father was also very controlling of mother and the children. J. similarly reported that mother and father continued to argue; she became emotional and refused to speak further with the CSW. Mother and father refused to make themselves available for an interview with DCFS and refused to allow the CSW to access the home. DCFS ultimately closed the referral as inconclusive.

## II. Referral and Petition

On September 15, 2019, DCFS received the instant referral after police were called to the family home in response to a report of domestic violence. Police found mother outside in her car, agitated. Mother told the police that she had "ongoing verbal disputes" with father for the past two years but denied any physical confrontations. That day, mother arrived home and tried to enter the bedroom of daughters J. and M. but found that father was inside the room and pushing against the door to prevent mother from entering. Mother told police that father was

4

under the influence of alcohol, and he had subsequently taken the three children and left.[3]

A CSW attempted to speak with the children at school on September 27, 2019, but all three refused. A CSW met with the family in their home on October 11, 2019. The CSW interviewed the family together after mother and father stated they would not let the CSW speak with the children alone. The parents also told the CSW not to ask the children about the incident, stating that the children were asleep at the time. All three children said that mother and father verbally argued but denied witnessing any physical altercations.

Mother and father also refused to be interviewed separately. Father denied the allegations, stating that he and mother verbally argued like any married couple. He stated that many of the calls to DCFS and law enforcement were initiated by mother and maternal grandmother and that the latest incident was a misunderstanding. He denied holding the bedroom door closed and denied being under the influence of alcohol during the incident. He refused to answer questions regarding prior referrals, including his possession of a gun. Mother told the CSW that the incident was a misunderstanding. She denied any domestic violence and denied that father had locked himself in their daughters' bedroom. She also denied stating that father

---

[3] Mother filed a request for a domestic violence restraining order (DVRO) against father protecting herself and the children in September 2019. The family court discharged mother's request in December 2019 after neither party appeared for a hearing. Mother later filed a new request for a DVRO against father, which the family court granted on January 6, 2020.

was under the influence of alcohol and refused to discuss prior referrals.

DCFS received another referral on December 10, 2019, reporting that mother brought J. to the emergency room because the child was not engaging with anyone, not attending school, not eating, and locking herself in her room. J. stated that mother and father were fighting every day and the dynamics in the home were causing her a lot of stress. According to the referral, when father arrived at the hospital, he asked to speak to J. alone and J. looked extremely tense. Father spoke with J. privately for a long time; afterward, J. appeared guarded and did not want to disclose further information. The hospital assessed J., determined she did not meet the criteria for a psychiatric hold, and released her to return home.

A CSW spoke with maternal grandmother, who stated that the domestic violence between mother and father was beginning to impact the children, including J.'s refusal to attend school and her increased anxiety. Maternal grandmother stated that she had had concerns about the children in the home for the past year and that she believed father's mental health was declining.

DCFS received another referral on December 16, 2019, reporting that mother and father were in the middle of a divorce but continued to live together, and that there were six guns in the home. Mother stated that some of the guns were "fake," but she had never examined the weapons as she was too scared to do so. She also stated that there was a gun in the family vehicle, and she did not know how or where all of the weapons were stored in the home. The caller also relayed reports from mother that father's mental health appeared to be rapidly declining and that he had been exhibiting odd behavior and ranting to himself.

The caller also stated that J. was displaying signs of depression and anxiety.

On December 18, 2019, mother's therapist reported to DCFS that mother had admitted that there had been domestic violence between her and father in the children's presence. Mother stated that she and the children did not discuss the fact that father had guns in the home out of fear of father.

DCFS filed a dependency petition on December 18, 2019 on behalf of sixteen-year-old Mi., fourteen-year-old J., and eight-year-old M. under section 300, subdivisions (a) and (b)(1).[4] In counts a-1 and b-1, the petition alleged that mother and father had a history of domestic violence, and that the police were called to the family home multiple times in 2019 as a result. The petition further alleged that mother and father had verbal altercations on numerous occasions in the home and children's presence. The children were detained from mother and father and placed with maternal grandparents.

At the December 19, 2019 detention hearing, the court found a prima facie case for jurisdiction over the children under section 300. The court ordered the children to remain detained

---

[4] Section 300 states, in relevant part, "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:  (a) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent. . . . [¶] (b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of . . . the failure or inability of the child's parent... to adequately supervise or protect the child."

from mother and father in the home of maternal grandparents, with monitored visitation for the parents.

### III.    Jurisdiction/Disposition Report

DCFS filed a first amended petition on January 22, 2020, alleging jurisdiction under section 300, subdivisions (a), (b)(1), (c), and (j).  In amended counts a-1 and b-1, the petition alleged that mother and father engaged in violent altercations on numerous occasions in the children's presence, including on July 24, 2018, when law enforcement was contacted due to an "ongoing problem of mother and father yelling and items being thrown."  The petition also alleged that law enforcement was contacted on June 29, July 15, September 15, and September 27, 2019, for altercations between mother and father including father vandalizing mother's property, father refusing to allow mother access to the home or the children, and father pushing mother into a wall and harassing her, resulting in mother locking herself and the children in a bedroom.  During several of these incidents mother reported that she was fearful of father. The petition further alleged that mother failed to protect the children by allowing father to reside with them and have access to the children, and that the parents' conduct endangered the children.

The amended petition added count b-2, alleging that father had a history of substance abuse, was a current abuser of marijuana and alcohol, and had been under the influence while caring for the children.  Added counts b-3, c-1, and j-1 alleged that mother and father created a detrimental and endangering situation and "continuously emotionally abused" J. by exposing her to "their ongoing violent altercations," and that J.'s "mental

8

health has declined due to the family dynamics in the home," including displaying signs of depression and anxiety. On prior occasions, J. threatened to harm herself with a knife, to jump from a moving vehicle, and to overdose with pills.

In its January 2020 jurisdiction/disposition report, DCFS reported that father had prior criminal convictions in 1992 for receiving stolen property, burglary, grand theft, and assault with a deadly weapon. DCFS met with the children on January 3, 2020 at the home of maternal grandparents. M. said that she liked living with maternal grandparents. She stated that mother and father had been fighting as long as she could remember, and that they often fought at night, waking her up. She reported an incident in which father carried mother out of the home and another in which he kept mother from entering the bedroom.

The CSW also met with J., who stated that lately she had been overwhelmed by feelings of sadness and confusion. J. reported that mother and father began fighting after father accused mother of infidelity and became vigilant in monitoring mother's activities. J. stated that her feelings of sadness and hopelessness increased in November 2019 and she felt that the worst thing in her life was how things were going with the family. J. said that when mother and father fought, father yelled at mother, berating her and calling her demeaning names. She also stated that father tried to keep the children from going places with mother. J. told the CSW that she felt father was negative and that she tried to avoid him. She no longer wanted to play softball and father took it personally, one time yelling and screaming at her when she did not want to get out of the car for practice. She felt that father's negative and controlling energy

took a toll on her emotionally.  As a result, J. stated that she had contemplated self-harm.

J. confirmed finding a gun in the family car.  She confirmed her parents' history of domestic violence, stating that father was the perpetrator.  J. recounted the incident in which father blocked mother from entering J.'s bedroom, and that afterward father took J. and M. to paternal grandmother's house and would not let them leave.  She also reported that mother would often leave the house to avoid fighting with father, leaving the children at home, and that she would hear father call mother and continue to yell accusations and insults over the phone.

Mi. told the CSW that he did not want father to know what they were talking about.  He said that he previously gave social workers a detailed report but nothing changed.

DCFS met with mother several times in January 2020.  Mother stated that in 2018, father accused her of infidelity and began monitoring her communications.  Father also started spending more time alone in their bedroom, drinking.  She acknowledged that they had a history of domestic violence and that the children were affected by it.  She confirmed that father would yell demeaning things at her and that she called the police multiple times in 2018 and 2019.

DCFS also met with father twice in January 2020.  He stated that he had been living with paternal grandmother since mother served him with a restraining order.  He denied having any guns and stated that as a convicted felon, he was not allowed to own guns.  He admitted to having a BB gun and claimed that was the gun J. had seen in the car.  Father acknowledged that he and mother had a verbal argument in 2018 over her contact with an ex-boyfriend, resulting in his distrust of mother and regular

arguments between them. He denied that these arguments occurred in the children's presence or escalated to physical violence. He denied any history of domestic violence and stated that when mother called the police she gave false reports. Father also claimed that he and J. had always been close, but mother was turning J. against him. He denied drinking to the point of intoxication and claimed he had stopped using marijuana before the start of 2020. When the CSW noted he had a positive toxicology screening for marijuana on January 14, 2020, father responded that he did not smoke around the children or when he was caring for them. Father told DCFS that he wanted to reunify with the family and had moved past mother's infidelity. He submitted proof of enrollment in a domestic violence program on January 14, 2020.

J.'s academic advisor told DCFS that J. stopped attending school in November 2019, but had been doing well up to that point. The advisor noted that around the same time J. had begun to disengage. The advisor also reported that during a meeting in December, mother appeared to be thoughtful and concerned, while father was highly distractible and "went off the rails" while screaming about athletics. The advisor and mother arranged for J. to take her final exams in January 2020 so that she would get credit for the fall semester.

DCFS also spoke with a former teacher at the children's middle school. She recalled that Mi. was often absent or late to school and tended to be tired. She also stated that father was hard on Mi. about sports and screamed at him if he did not perform. Father was a volunteer coach but was not allowed to be alone with the children because he tended to yell and say unkind

11

things to the children and to staff. Father was eventually asked not to coach or come to campus.

DCFS concluded that the children were at "very high" risk for future abuse and neglect based on the parents' "extensive history of engaging in violent altercations, minimizing, denials and misleading statements coupled with their lack of insight, empathy, and interference with the investigation." DCFS also cited father's unresolved substance abuse issues and mother's failure to protect.

In a last-minute information on January 28, 2020, DCFS reported that according to J.'s therapist, when J. started therapy she was severely depressed and "plagued by feelings of hopelessness and helplessness due to the family situation and ongoing conflict between mother and father." However, once the children were removed from the family home, J.'s symptoms significantly dissipated.

In a last-minute information on February 26, 2020, DCFS reported that father had been participating in his domestic violence program. Father appeared motivated and was developing insight into his role in the family situation and how the children were affected negatively by the home environment.

IV.    **Adjudication and Disposition**

At the adjudication hearing on February 26, 2020, the juvenile court dismissed counts a-1, b-2, b-3, c-1, and j-1 from the first amended petition. The court amended the remaining count b-1 by striking the allegations regarding domestic violence by mother and father, instead alleging that they had a history of "parental conflict that places the children at risk of harm," and that law enforcement was contacted on multiple occasions in 2018 and 2019 "due to ongoing parental conflict." The amended

count b-1 also added the allegation that J.'s "mental health has declined due to the family dynamics in the home," that she was "displaying signs of depression and anxiety," had become "withdrawn and isolative," stopped attending school in November 2019 due to severe anxiety, and was taken to the emergency room in December 2019 because she was not eating, not engaging with anyone, and was locking herself in her room.

Mother and father pled no contest to count b-1 as amended. The court sustained the amended petition, found jurisdiction over all three children under section 300, subdivision (b)(1), and found by clear and convincing evidence under section 361 that removing the children from mother and father was necessary. The court ordered monitored visitation for both parents, domestic violence and parenting programs for father, on demand drug tests for father, individual counseling for both parents, and conjoint counseling for both parents with the children if recommended by the children's therapists.

## V. Period of Review

In a status review report on August 21, 2020, DCFS reported that the children continued to do well in the care of maternal grandparents. Mother told DCFS that she had filed for divorce, although she was still living with father. The CSW made attempts to discuss the case with father but was unable to do so.

Both M. and Mi. appeared to be doing well. Maternal grandparents stated that J. was having a harder time than her siblings, and J. stated she was struggling with being separated from her parents, especially mother. Mother and J. had begun conjoint counseling.

DCFS reported that father had completed his 26-week domestic violence program with demonstrated participation and

13

effort. Father stated he was eager to begin conjoint counseling with J., but J.'s therapist had not yet recommended it. Father also completed his parenting class and was participating in individual therapy. Father's therapist could not disclose any information regarding any progress by father without a signed release from him.

The children, mother, and father reported that their visits were going well. During visits, the children appeared to be close with both parents. DCFS observed that father's relationship with the children appeared playful, loving, and secure. DCFS liberalized both parents' visits to unmonitored full day visits. However, DCFS expressed concern that the parents continued to live together. DCFS assessed the children as having a moderate risk of harm if returned to the care of their parents. DCFS recommended continued family reunification services with the goal of returning the children to the home of parents prior to the next review.

At the six-month review hearing, the court granted DCFS continued discretion to liberalize visitation and requested supplemental reports. DCFS filed an interim review report in October 2020. Mother and father began separate overnight visits with the children in mid-September 2020. Each parent agreed to leave the family home during the other parent's overnight visits.

Mi. and J. told DCFS that mother and father's separation was a good thing. J. stated that she was doing well in school and loved both parents, but preferred to live with mother. She reported that she did not feel she could speak to father freely and was not yet ready to begin family counseling. J.'s therapist agreed that J. was not yet ready for family therapy.

14

Mother reported that she would not be "controlled" by father again but she did not believe father fully grasped the idea of the separation and divorce. Father told the CSW that it was important for his family to be together and he wanted to move on as a family. He appeared to have difficulty accepting that mother had filed for divorce, stating he believed mother was doing it because DCFS wanted her to. Mother's therapist stated she believed the children would be safe in mother's care and that mother had come a long way in her sessions. The parents reported that there had been no conflicts although they continued to live together. DCFS reported that both parents continued to participate in their court-ordered services and showed insight into past behaviors.

In a last-minute information submitted to the court on October 8, 2020, maternal great-aunt reported that father threatened mother by text that "the only way you're getting out of this marriage is if you die." Maternal great-aunt was living with mother and father in the family home for about a month and described father's temperament as a "time bomb."

Mother reported that she did not want to be with father, but he was "delusional" and "thinks we're better than ever." She did not think that father would hurt the children, but she was concerned about J.'s mental health because of father's manipulation. Mother denied that the text from father was threatening but contended that father was verbally and financially abusive.

Father told the CSW that mother was pursuing separation only because she thought she had to in order to regain custody of the children, but that she told him that "we can work on things" and his goal continued to be reunification. Father also said that

he would do whatever was required to be able to spend time with the children.  DCFS expressed concern for the children's risk of exposure to domestic violence as mother and father navigated a contentious separation, but recommended a home of parents order, with shared physical custody.

At the review hearing on October 9, 2020, the court found that the progress by mother and father had been substantial and return of the children to their custody would not create a substantial risk of harm.  The court ordered the children returned to mother's and father's custody, with DCFS providing family preservation services.  The court scheduled a review hearing pursuant to section 364 and ordered DCFS to assess the appropriateness of terminating jurisdiction.

Mother and father reached a mediation agreement on October 15, 2020, providing that they would equally share physical custody of the children.  Under the agreement, mother had parenting time with the children Monday to Thursday morning, father had parenting time Thursday to Sunday morning, and they would alternate parenting time on Sundays.  They also agreed that the children would stay in the family home and mother and father would rotate in and out for their custodial time.

In January 2021, mother told DCFS that she had moved to an apartment because she no longer felt safe in the family home, even with the custody agreement that father would not be present during her time.  She stated that she found marijuana in the home in January and believed father was not sober while caring for the children.  DCFS requested that both parents take a drug test.  Mother's test was negative.  On January 13, 2021, the CSW confirmed with father their scheduled assessment visit for

the following day and notified father that he would need to submit to the drug test. Father did not appear for either the drug test or the monthly visit.

On February 4, 2021, mother reported that she was having difficulty co-parenting with father. She stated that father often changed his schedule and was not present with the children during his custodial time. Father did not respond to the CSW's requests for a check in for February.

In March, mother told DCFS that the children were staying in her apartment full-time, rather than the family home. The children visited father intermittently on weekends. Mother stated that she wanted full custody of the children, and that father often left the children unattended for hours at a time. She reported that Mi. did not feel comfortable leaving M. alone with father and insisted on accompanying M. to visits to ensure she was cared for.

The CSW made multiple requests to father regarding his availability to meet between January and March 2021 to assess his progress. Father agreed but never provided his availability to the CSW. Father continued to attend therapy, but had not signed a release of information, so his therapist could not comment on his progress.

In an April 2021 status report, all three children stated that they were happy living full-time with mother in her apartment. J. reported that she had not been back to the family home to visit father in months because she no longer felt comfortable being there with him. M. told the CSW that she did not see father during his visits, as he would often leave the home and she did not know where he went. She stated that Mi. would

17

prepare her food if she was hungry, until father returned home with takeout food around 9:00 p.m.

The CSW stated that each parent claimed the other parent was not following their mediation agreement. Mother stated that father did not inform her when he was going to arrive at the family home so that she could drop the children off there. Father stated that mother often stayed during his custodial time, saying she needed to do laundry or other chores.

The CSW assessed the interactions between mother and the children as caring and attentive. The CSW assessed father with Mi. and M. during two visits, and observed that the children appeared comfortable with him and they appeared to have a loving relationship. Although M. reported that father would often leave at night and she would not see him until the afternoon the following day, father denied leaving the children alone for hours, stating that they were always supervised by himself or mother. Father had not made himself available to meet with the CSW to discuss his case progress since November 2020.

DCFS concluded that it had continued concerns regarding the parents' high-conflict divorce and their ability to co-parent effectively, as well as the lack of information regarding father's progress in therapy. However, DCFS observed that the children had made positive strides in their mental health and education under mother's care. DCFS assessed that the risk of harm to the children was low and recommended terminating jurisdiction, with an exit order awarding joint legal custody to the parents, sole physical custody to mother, and unmonitored visitation for father.

In a last-minute information on May 17, 2021, DCFS reported that co-parenting between mother and father was an "ongoing issue." The CSW recommended that the parents utilize a co-parenting app to assist with respectful communication. Mother agreed to use any tool agreed upon, but father had not responded, and their communication "remain[ed] contentious."

DCFS also reported that father continued to fail to respond to requests to meet to discuss his case plan, and he had not provided progress letters regarding his individual counseling. Mother and the children consistently reported that they were doing well living together full-time. J. refused to have any visitation with father.

## VI. Section 364 Review Hearing

The court held the contested section 364 review hearing on May 18, 2021. Father testified that although he and mother had agreed that the children would remain living in the family home, they were now only there during his parenting time. He complained that he usually did not see all three children starting on Thursdays per the agreement and often had to pick them up from mother. There were some instances when mother requested to have the children during father's time, and father would agree "at least nine times out of ten," but never intended that to be a permanent change to the agreement. He also said that he had communicated multiple times with DCFS about not getting his full amount of parenting time, but received no assistance.

Father testified that he and J. used to be very close, but now he had no relationship with her, which he attributed to mother having "undermined" his efforts to help J. Mi. told him that mother and J. spoke negatively about him "constantly." Father claimed that he was not kept apprised of the children's

schooling or medical issues, and when he asked about them he was ignored.  He was very concerned about J., as he heard from the other children that she was not going to school, was staying up all night, never left the house, and her occasional text message replies to him were rude and disrespectful.  He wanted the custody to remain equally split.

When asked by mother's counsel whether he had responded to the CSW's inquiries about using an app to communicate with mother, he testified that his response to the CSW was that "my problem is not communication; my problem is visitation and getting my visitation when it's my time. . . .  I'm not terribly interested in communicating with [mother]."  He acknowledged the emails between him, mother, and the CSW, in which mother complained that he was not at the family home for the scheduled drop off on Thursday mornings.

Father's counsel argued that the court should retain jurisdiction over the family.  Alternatively, he requested that the court close the case leaving the mediated agreement in place, arguing that nothing in the record "would warrant mother to have primary custody, other than the situation that mother has created herself."

Mother's counsel agreed with DCFS's recommendation for her to have sole physical custody and father to have unmonitored visits with the children.  Counsel for the children also agreed with DCFS's recommendation, echoing the argument by counsel for mother that father's testimony was inconsistent with the reports from DCFS.  He noted that the children had expressed their desire to live with mother and that she provided stability for them.

The court dismissed Mi. from the petition, as he was now 18 years old. As to minors J. and M., the court found that the conditions justifying the assumption of jurisdiction no longer existed and therefore terminated jurisdiction. The court ordered counsel to draft a juvenile custody order awarding mother and father joint legal custody of the children, with sole physical custody to mother. The court found that although father had completed some of the items on his case plan, including his domestic violence program, he had not signed the release to allow DCFS to assess his progress. The court further noted father's "pattern of . . . noncompliance and his lack of cooperation with the social worker," including failing to meet with the CSW when requested and failing to respond to the CSW's request that he use the recommended communication tools to facilitate his co-parenting with mother.

The court also found, "most importantly," that the best interest of the children supported awarding physical custody to mother, as both J. and M. stated that they were more comfortable living with mother and J. said she was not comfortable in the home with father. The court noted the reports by the children that father would leave in the middle of the night, they would not know when he was going to return, and that Mi. had to prepare food in his absence. The court also cited J.'s statements that father had pressured her about playing sports and caused her stress, and that J. was now suffering from severe anxiety and mental health issues. The court found no evidence that the statements from the children were influenced by mother. The court concluded that sole physical custody to mother was in the children's best interests because all of the children said that "mother is consistent in her care, and they feel that the mother is

21

more reliable.  And all of them feel safe in the mother's care, and the evidence demonstrates that they have been thriving in the mother's care."

The court ordered unmonitored visitation for father, including overnight visits.  After the court admonished the parties that they would have to agree upon a visitation schedule, mother stated that she was willing to continue with the schedule set forth in their prior agreement.

Father timely appealed from the court's May 18, 2021 orders.

## DISCUSSION

### I.    Termination of Jurisdiction

Father contends that the juvenile court abused its discretion in terminating jurisdiction over J. and M., because conditions continued to exist that would justify ongoing supervision.  We find no error.

#### A.    *Legal Principles*

When the juvenile court takes jurisdiction over a child at the disposition hearing but does not remove the child from the custody of the previously-custodial parent, section 364 governs review hearings. (§ 364, subd. (a).)   Section 364 also applies when a child has been removed, but then returned to the custodial parent(s), as here.  (See *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 313-316; *In re N.S.* (2002) 97 Cal.App.4th 167, 171-172.)  At a section 364 hearing, "the court shall determine whether continued supervision is necessary.  The court shall terminate its jurisdiction unless [DCFS] establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction ... or that those conditions are likely to exist if supervision is withdrawn."

22

(§ 364, subd. (c).)  Thus, "[w]here, as here, the social services agency recommends termination of jurisdiction, termination will be the 'default result' unless either the parent, the guardian, or the child objects and establishes by a preponderance of the evidence that conditions justifying retention of jurisdiction exist or are likely to exist if supervision is withdrawn."  (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1163.)

Because father, as the appealing party, failed to carry his burden of proof below, we review the juvenile court's ruling under the standard of *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527-1528, overruled in part on other grounds as stated in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010.  We therefore review "whether the evidence compels a finding in favor of the appellant as a matter of law," by examining "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'"  (*In re I.W., supra,* at p. 1528.)

**B.**  *Analysis*

Father asserts that the court should not have terminated jurisdiction at the section 364 hearing, and should have instead ordered six more months of services for the family.  As evidence of the need for continued jurisdiction, father cites J.'s continued mental health issues and lack of documentation that she was attending school, his deteriorating relationship with J., and the fact that he had not been able to begin conjoint counseling with her.  We conclude that father has not met his heavy burden to show that the evidence compels a finding in his favor.

Here, the juvenile court found that J. and M. were doing well living with mother, based on reports from the CSW, J.'s

23

therapist, and the children's own statements. Mother had separated from father and moved out of the home, and she and the children reported being happy to be living together. While J.'s issues with anxiety and depression were not fully resolved, she was regularly attending individual therapy as well as conjoint therapy with mother, was taking medication, and mother was committed to ensuring her continued care. J. and mother also reported that she was attending school online.

Moreover, although J's relationship with father had markedly deteriorated, father does not suggest how that would have been a basis for the assumption of jurisdiction under section 300, or even how six more months of services would have alleviated their issues, given J.'s refusal of visitation with him. Father complains that he was not able to begin conjoint counseling with J., but both J. and her therapist continued to state that she was not ready to do so. Under these circumstances, there was ample evidence supporting the court's decision to follow the recommendation of DCFS and conclude that conditions no longer existed to require the court's jurisdiction.

## II.    Custody Order

Father also argues that the juvenile court erred in granting sole physical custody to mother. Specifically, he contends that because the court removed the children from his custody, it was required to make a finding of detriment by clear and convincing evidence pursuant to section 361. We disagree. The court did not err in assessing the best interests of the children when making custodial exit orders or in granting sole physical custody to mother under that standard.

### A.    *Legal Principles*

24

Section 362.4 governs the termination of juvenile court jurisdiction and related orders.  The statute authorizes a juvenile court to make "exit orders" regarding custody and visitation upon terminating dependency jurisdiction over a child. (§ 362.4, subd. (a); *In re Chantal S.* (1996) 13 Cal.4th 196, 203; *In re Kenneth S., Jr.* (2008) 169 Cal.App.4th 1353, 1358.) These exit orders remain in effect until modified or terminated by a subsequent order of the superior court.  (§ 362.4, subd. (b); see also Cal. Rules of Court, rule 5.700.)

"[I]n making exit orders, the juvenile court must look at the best interests of the child." (*In re John W.* (1996) 41 Cal.App.4th 961, 973; see also *In re T.S.* (2020) 52 Cal.App.5th 503, 513 (*T.S.*) ["'When making a custody determination under section 362.4, 'the court's focus and primary consideration must always be the best interests of the child.'"], quoting *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268 (*Nicholas H.*).)  The court must be guided by the totality of the circumstances and issue orders that are in the child's best interests.  (*In re Chantal S.*, *supra*, 13 Cal.4th at p. 201; *In re Roger S.* (1992) 4 Cal.App.4th 25, 30–31.)  Because juvenile dependency proceedings arise when children are subject to or at risk of abuse or neglect, "[t]he presumption of parental fitness that underlies custody law in the family court just does not apply. . . .  Rather the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions." (*In re Jennifer R.* (1993) 14 Cal.App.4th 704, 712 (*Jennifer R.*); accord *Chantal S., supra*, 13 Cal.4th at p. 206.)

"[T]he juvenile court has broad discretion to make custody [and visitation] orders when it terminates jurisdiction in a

25

dependency case (§ 362.4)." (*Nicholas H., supra*, 112 Cal.App.4th at p. 265, fn. 4.) We review the juvenile court's exit orders for an abuse of that discretion. (See, e.g., *In re Maya L.* (2014) 232 Cal.App.4th 81, 102; *Jennifer R., supra*, 14 Cal.App.4th at p. 711; see also *In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) We will not disturb the juvenile court's decision "unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." (*In re Stephanie M.*, supra, 7 Cal.4th at p. 318.)

**B.** *Analysis*

Father argues the trial court erred in issuing the custody order without making a detriment finding as required by section 361, and that the evidence would not support a detriment finding against him in any event. Section 361 requires that "[a] dependent child shall not be taken from the physical custody of his or her parents . . . unless the juvenile court finds clear and convincing evidence [that] . . . [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c).)

However, section 361 findings are required at the disposition stage of dependency proceedings. The statute does not apply to custody and visitation determinations made at a section 364 review hearing concurrent with the termination of juvenile court jurisdiction. "To be sure, at the disposition stage of a dependency proceeding, a court may not remove a child from a parent's custody and place the child in the custody of [DCFS] unless the court finds there is a substantial danger to the child

26

and no available services to protect the child absent removal. [Citation.] . . . There is no statutory language, however, suggesting this standard be applied when the court issues a custody order upon the termination of jurisdiction pursuant to section 364. To the contrary, at [the section 364] stage of the proceedings, the court must consider the child's best interest." (*T.S., supra*, 52 Cal.App.5th at p. 515.)

Instead, section 362.4 governs the court's authority to issue exit orders determining custody and visitation of a child when terminating jurisdiction at a section 364 hearing. (§ 362.4, subd. (a); *In re Roger S.* (1992) 4 Cal.App.4th 25, 30.) Section 362.4 does not require a finding of detriment under any circumstances; as a result, courts have applied the best interest standard in determining appropriate custody and visitation exit orders at this stage. (See, e.g., *T.S., supra*, 52 Cal.App.5th at p. 513; *Nicholas H.*, *supra*, 112 Cal.App.4th at p. 268; *In re John W.*, *supra*, 41 Cal.App.4th at p. 973; *Jennifer R., supra*, 14 Cal.App.4th at p. 712.) Indeed, once the court found that terminating jurisdiction was appropriate because the dangerous conditions justifying assumption of jurisdiction under section 300 no longer existed, the court could not also find under section 361 that there was substantial danger to a child justifying removal from a custodial parent.

Father argues that section 361 nevertheless applies here, because the court returned custody to him at a review hearing, and then removed it again when awarding sole physical custody to mother and terminating jurisdiction. He fails to cite any authority supporting this contention. None of the cases father cites apply to a court terminating jurisdiction and issuing exit orders at a section 364 review hearing. For example, in *In re*

27

*D.D.* (2019) 32 Cal.App.5th 985, 987-988, the case on which father primarily relies, the juvenile court removed the children and then returned them to the mother's custody. DCFS then filed a supplemental petition under section 387, seeking to once again remove the children from the mother. (*Id.* at p. 988.) The juvenile court made a detriment finding under section 361, subdivision (c) at the dispositional hearing on the section 387 petition and removed the children. (*Id.* at p. 990.) On appeal, the court analyzed the juvenile court's dispositional finding that there was clear and convincing evidence of a risk of detriment requiring removal. (*Id.* at p. 996 ["'When a section 387 petition seeks to remove a minor from parental custody, the court applies the procedures and protections of section 361.'"].) Thus, this case does not assist father, as it did not involve custodial exit orders issued at a section 364 hearing. In fact, none of the cases upon which father relies involve custodial exit orders. (See *In re Henry V.* (2004) 119 Cal.App.4th 522, 528-529 [applying section 361 at dispositional hearing]; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654 [same].)

As such, father has failed to show that the juvenile court was required to make a detriment finding under section 361 in connection with its custody order. The court here applied the correct standard in considering the best interests of the children in awarding sole physical custody to mother. Father does not otherwise contend that the evidence does not support the court's finding under the best interest standard.

Instead, father argues that the custody order was "inconsistent" with the court's order allowing him unmonitored visitation and incorporating the mediated agreement which gave father 50/50 visiting time. He cites no authority for the

28

proposition that the decision by DCFS and the court that it was sufficiently safe to allow unmonitored visitation with the children also meant the court was required to order physical custody for that parent. (See, e.g., *Dabney v. Dabney* (2002) 104 Cal.App.4th 379, 384 ["We need not consider an argument for which no authority is furnished"]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 ["When an appellant . . . asserts [a point] but fails to support it with reasoned argument and citations to authority, we treat the point as waived."]; Cal. Rules of Court, rule 8.204(a)(1)(B).)

As we have discussed, the court was charged with making custody and visitation orders that were in the best interest of the children, considering the totality of the circumstances. We find no abuse of discretion in the court's conclusion that awarding sole physical custody to mother was in the children's best interest, as recommended by DCFS and requested by mother and the children, and where J. stated she was not comfortable visiting or living with father at all. The court's order was further supported by the evidence that father had failed to comply with on demand drug testing, failed to meet with the CSW for assessment for months, blamed mother for his relationship issues with J., blamed DCFS and mother for his lack of conjoint counseling, was frequently absent during his parenting time, and refused to agree to use the recommended co-parenting app. Moreover, the court did not abuse its discretion in ordering the parents to comply with their own mediated agreement regarding visitation. "Should circumstances change in the future [father] is free to seek joint [physical] custody in the family law court." (*Jennifer R., supra*, 14 Cal.App.4th at pp. 713-714.)

## DISPOSITION

29

The orders terminating jurisdiction and granting sole physical custody to mother are affirmed.



COLLINS, ACTING P.J.

We concur:


CURREY, J.


STONE, J.[*]

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 3/10/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re J.M. et al., Persons Coming Under the Juvenile Court Law. | B313754 (Los Angeles County  Super. Ct. Nos. 19CCJP08077, 19CCJP08077B 19CCJP08077C |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  M.M.,  Defendant and Appellant. | ORDER GRANTING  PUBLICATION REQUEST |

THE COURT*:

The opinion in the above-entitled matter filed on March 2, 2023 was not certified for publication in the Official Reports. Upon application of respondent and for good cause appearing, it is ordered that the opinion shall be published in the Official Reports.

Pursuant to California Rules of Court, rule 8.1105(b), this opinion is certified for publication.

_____

*COLLINS, ACTING P.J.            CURREY, J.            STONE, J**

_____

** Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.